Heyer Products Company, Incorporated v. Commissioner.
Heyer Prods. Co. v. Commissioner
Docket No. 11215.
United States Tax Court
1947 Tax Ct. Memo LEXIS 43; 6 T.C.M. (CCH) 1196; T.C.M. (RIA) 47302; October 31, 1947
*43 Benjamin Alpert, Esq., for the petitioner. Frances X. Gallagher, Esq., for the respondent. HILL Memorandum Findings of Fact and Opinion HILL, Judge: Respondent determined deficiencies in petitioner's income, declared value excess-profits and excess profits taxes for 1942 in the respective amounts of $3,877.42, $2,712.62 and $70,075.08. Respondent also determined a deficiency in petitioner's excess profits tax for 1943 in the amount of $23,470.29. The deficiencies result from various adjustments but only two are contested. The questions are, (1) the reasonableness of compensation paid by petitioner to its president and, (2) whether respondent correctly added to petitioner's income for 1942 an item credited on its books as a contingent reserve. Returns were filed with the collector of internal revenue for the fifth district of New Jersey. The facts have been partially stipulated, which stipulation is hereby adopted. Findings of Fact Compensation Issue. Petitioner is a New Jersey corporation with its principal place of business at Belleville, New Jersey. B. F. W. Heyer is petitioner's president and principal stockholder. Petitioner paid Heyer $84,747.74 and *44 $59,804.83, respectively., as compensation for the years 1942 and 1943. [1] Respondent determined $20,000 a year to be reasonable compensation and consequently limited petitioner's deductions on this account to this amount for 1942 and 1943. The amounts in controversy paid by petitioner to Heyer as compensation were determined according to a formula by which Heyer's compensation had been determined since 1927. In 1927 Heyer entered into an employment contract with petitioner covering a two-year period, commencing January 1 of that year. By the terms of this contract Heyer was to receive for his services as president and general manager a salary based on a percentage of sales but not, in any event, to be less than $5,000 a year. The contract provided that: "Said salary shall be computed at the end of each calendar month and paid promptly thereafter on the basis of five per cent. (5%) of the net monthly sales so long as Heyer is able to maintain the gross profits of the Company at a figure of not less than forty per cent. (40%) of the net sales. *45 In the event, however, that said gross profits are less than forty per cent. (40%) in any month, said five per cent. (5%) shall be decreased in the same proportion as the decrease in gross profits below forty per cent. (40%). For example: if the gross profits should be only twenty per cent. (20%) for any given month, then and in that event the salary for that month would be two and one-half per cent. (2 1/2%) of the net sales for the month. "It is understood that gross profits shall be determined in the same manner as they are now computed and have been computed since the formation of the Company, namely, net cost of labor and material deducted from the net sales." The events leading up to this agreement were as follows: Prior to 1923 Heyer had invented certain battery charging and electrical testing equipment. At this time he worked in his father's small garage while taking electrical engineering at Columbia University. Heyer needed capital to manufacture and sell these devices. He interested Newell P. Weed in the project. Weed was a Wall Street financier, who had his car taken care of at the garage where Heyer worked. Weed, William Morris Imbrie, Jr., and William H. Herron entered *46 into arrangements with Heyer to supply the necessary capital. By a written agreement dated April 7, 1923, these backers agreed to form a company and furnish it money. Heyer agreed to manage the company and to transfer to it his patents. The backers were to get one-half of the company's issued stock and Heyer was to get the other one-half. Pursuant to this agreement petitioner was formed. In 1925 Heyer became dissatisfied with this arrangement and he contemplated forming a separate sales company which would do the selling for petitioner and which he, Heyer, would own and control. The backers opposed this development because they feared it would adversely affect petitioner's profits. As a compromise the employment contract quoted above was arranged whereby Heyer was to be compensated on the basis of a percentage of petitioner's sales. The backers wanted to make the employment contract for a longer term than two years but Heyer refused. The backers were prepared to agree to compensate Heyer on a percentage of sales basis as high as 10 per cent or 15 per cent. Although this employment agreement terminated by its own terms on December 31, 1928, the percentage formula it provided has been *47 followed ever since in determining Heyer's compensation. The following schedule shows, among other things, the salary received by Heyer from petitioner for the years indicated: Net Income per
Gross Profit
tax returns or
reported on
as adjusted by
Dividend
Salary paid to
Year
Sales
returns
Commissioner
Payments
B. F. W. Heyer
1935
$ 780,393.81
$290,243.84
$ 67,590.59 $55,807.22
1936
712,163.35
269,068.69
95,544.70 $46,900.57
29,852.06
1937
642,152.89
253,335.94
14,715.28 9,851.00
30,750.28
1938
546,029.29
219,317.37
1,481.62 9,851.00
24,877.09
1939
571,383.79
232,777.18
(24,411.76)
6,448.00
28,573.36
1940
585,905.68
238,783.24
* (27,529.52)
7,248.00
29,290.08
1941
946,712.62
403,733.47
* 28,399.65 6,848.00
47,335.62
1942
2,024,026.51
389,201.55
* 110,053.82 6,448.00
85,631.56
1943
1,360,747.09
308,139.95
* 32,934.99 6,448.00
59,925.05
From 1923 to 1926, inclusive, petitioner had 1,502 outstanding shares of common stock which were held as follows: *48 Heyer 751, Imbrie 417, Weed and Herron 167 each. In 1927 the outstanding common shares of stock were increased to 3,002, which until December of that year were held as follows: Heyer 1,501, Imbrie 834, Weed 500 and Herron 167. In December 1927 the holdings changed to the following: Heyer 2,701, Weed 300, Arthur P. Heyer 1 share. From 1930 to 1943, inclusive, petitioner's outstanding shares of common stock have been between 3,002 and 3,006, of which Heyer has individually held not less than 1,929 or more than 1,995. During this same period Lawrence L. Heyer held 10 shares. From 1939 to 1944, inclusive, Lillian K. Heyer has held 1,063 shares. Consequently, from 1939 to 1944, inclusive, there were not more than 4 shares of petitioner's common stock not held by a Heyer. At first Heyer undertook to have the devices he developed sold on behalf of petitioner by salesmen who contacted jobbers. This was an expensive method of selling. Heyer altered petitioner's sales policy. He contacted companies such as Ford, Exide and Willard, which distributed auto maintenance equipment on a national scale. He discussed with such companies their requirements and specifications for maintenance equipment. *49 He then designed, engineered and developed the equipment desired. After such a device met the tests and requirements established by the companies it would be manufactured by petitioner but under the name of the purchasing company. Such equipment would usually be sold by petitioner directly to the distributing company which would retail it through their national outlets. This sales policy increased the volume of petitioner's sales and obviated the necessity for a sales force. Petitioner's sales therefore depended on Heyer's contact with large distributing companies and his ability to invent, engineer and develop the equipment these companies require. The contacts are established and maintained and the inventing, engineering and developing are done for petitioner almost exclusively by Heyer individually. Patents are taken out in Heyer's name. In some few instances patents have been taken out for greater protection in Heyer's name and a co-inventor's name. Heyer has taken out approximately 25 patents. This patent protection is of great value to petitioner because they usually constitute petitioner the exclusive source of items of equipment sold to the large companies. From 1926 to 1936 *50 Heyer gave petitioner exclusive licenses to the patents taken out in his name. In 1936 the patents were transferred to the Knickerbocker Development Corporation which was controlled by Heyer. Knickerbocker granted petitioner exclusive licenses to the patents held by it. No royalty was paid by petitioner to Knickerbocker for the licenses but a consideration passed between them in 1936. Part of the consideration related to the sale of certain special meters manufactured by Knickerbocker. Petitioner also paid Knickerbocker a cash consideration of $45,000. In addition to the patents already mentioned Heyer bought several patents on a type of battery connector. He licensed petitioner and Whittacker Cable Supply Company to manufacture connectors under these patents on a royalty basis from which he received in 1942 and 1943 the respective amounts of $678.62 and $1,030.73. With the exception next noted and with the exception of certain military items hereinafter mentioned petitioner was not authorized and did not grant sublicenses. Some time in 1946 Heyer authorized petitioner to, and petitioner did, sublicense the Regent Electrical Manufacturing Company in Canada to manufacture a fast battery *51 charger on a royalty of approximately $14 a unit with production contemplated at the rate of 3,000 units a year. The period of development prneceding the mass maufacture and sale deliveries of an item by petitioner averaged about a year and a half. Essential new developments in existing items or the development of new ones occurred on the average of every two years. Heyer was on a percentage of sales basis. The contributions to his compensation from the percentage of sales of such items came only after the designing, engineering, developing and inventive work on it had been done, or a year or two after such work was begun. In 1939 Heyer became concerned over the consequences of M-Day on petitioner's business. The Army's plan for petitioner on M-Day was to assign petitioner's full capacity to the manufacture of transformers for the Signal Corps. Since only about 10 per cent of petitioner's manufacturing capacity was equipped for this type of manufacture Heyer thought petitioner's capacity could more efficiently be put to some other use for military purpose. Consequently in 1940 Heyer undertook a survey to determine a better plan for petitioner's use in case of war. For the purposes *52 of this survey petitioner hired the services of Robert L. Gray, who was then a consulting engineer. Grey was a West Point graduate and a retired Colonel. He had a considerable acquaintance with high ranking Army officers and army vehicular equipment. During 1940 Heyer and Gray studied and surveyed Army requirements in the field of what is termed "preventative maintenance" for vehicles and tanks. They visited various military installations such as Aberdeen Proving Grounds and Ft. Benning, which was then headquarters of the First Armored Corps. They also observed at first hand the National Guard maneuvers near Ogdensburg, New York, in August 1940. From these observations and from conversations with officers concerned with maintenance problems Heyer and Gray came to certain conclusions concerning Army needs and requirements in this field. In September 1940 Heyer and Gray had a meeting with a board of Army officers in Washington. At this meeting Heyer announced his conclusions and made certain suggestions. The Army was interested and encouraged Heyer to develop certain items of maintenance equipment which Heyer had suggested, the ultimate specifications and requirements of which had been *53 agreed upon at the meeting. Heyer designed engineered and developed these items by mid-1941. He developed four maintenance items as follows: a low voltage circuit tester, an ignition tester, a battery tester and a battery charger. These items were new in the sense that they had never been standard items of equipment before Heyer's development of them. Heyer took out patents on certain aspects of these items. Petitioner was licensed to use the patents and was authorized and did sublicense other companies to manufacture the items for the Army, royalty free. During 1942 petitioner's gross sales amounted to $2,024,026.51 of which $1,451,015.01 represented government sales or approximately 75 per cent. In 1943 petitioner's gross sales amounted to $1,360,747.09, of which $1,166,182.93 represented government sales, or approximately 85 per cent. In May 1941 petitioner hired Gray as vice-president and general manager for a five-year period under a written agreement. Petitioner agreed to pay Gray a salary of $15,000 a year plus a cash bonus consisting of 2 per cent of gross sales in excess of $600,000 and 2 1/2 per cent if sales exceeded $800,000 a year. Under this agreement petitioner paid *54 Gray $48,100.67 and $33,048.32, respectively, in 1942 and 1943, which has not been disallowed to petitioner as a deduction by respondent. Gray was employed by petitioner primarily because Heyer wanted to be relieved from the burden of management problems. Heyer enjoyed the engineering, developing and inventive phase of the work as well as his contacts with customers but he did not enjoy the administrative work of operating the manufacturing. Gray was hired to assume the management duties and leave Heyer free to devote his time to designing, developing and selling. Gray, during the survey of Army requirements when he had been acting as consulting engineer to petitioner, had favorably impressed Heyer with his executive ability and his knowledge of technical and manufacturing problems. Gray's contacts in Army circles, coupled with these abilities, recommended him for the position. In May 1941, when Gray was hired, Heyer had no intention or expection of ever entering military service. The Air Corps, however, became interested in Heyer through conversations with Gray. They had serious maintenance problems and wanted Heyer's services in this connection. Heyer was asked to apply for a commission *55 which he did. In May 1942 he went on active duty as a major and was assigned at first to Wright Field. In July 1943 Heyer left Wright Field for service in England and was absent from this country for the remainder of that year. While Heyer was in service he did no designing, developing, engineering inventing or selling work for petitioner. During this period there was no selling work to do for petitioner because its production capacity was almost wholly committed under government contracts. For the same reason and because of the wartime restrictions, no new development had been undertaken by petitioner during 1942 and 1943. After Heyer entered upon active duty and while stationed in the United States he was in continual touch with petitioner's affairs and continued to act in an advisory and policy making capacity. While stationed at Wright Field Heyer talked to Gray on the telephone two or three times a week. He had about 15 business conferences during this period. He also had 14 days of leave which he spent on petitioner's problems. While at Wright Field Heyer spent large sums of money entertaining the representatives of petitioner's commercial customers. These representatives visited *56 Wright Field frequently on business they had with the Air Corps. In addition to Heyer, the only other of petitioner's executive staff to enter military service was Mohlen who was a field engineer. Petitioner was anxious to retain his services after the war and he received from petitioner his ordinary salary while he was in military service. Compensation paid by petitioner to Heyer for services in the years 1942 and 1943, in the respective amounts of $84,747.74 and $59,804.83, was reasonable. Contingent Reserve Issue. In 1935 an account payable item designated "K. R. Wilson" was set up and accrued on petitioner's books in the amount of $21,320 and a deduction taken therefor in its tax return for 1935. Wilson had spent time and money in connection with the selling of an item of petitioner's equipment to Ford and the account payable set up by petitioner in his favor represented his fee or commission. There was disagreement between petitioner and Wilson as to the amount. Petitioner and Heyer considered the amount set up as at least adequate and Wilson considered it too small. Between 1935 and 1939 certain charges were made to this account so that as of December 31, 1939, Wilson's *57 account had a credit balance of $13,814.87. From 1940 to 1942 this account remained dormant. In 1942 petitioner's accountant charged this account with $13,814.87 and set up a reserve for contingencies in a similar amount. This amount was never credited to surplus. In 1942 while Heyer was in service he wrote a memorandum to the other officers of petitioner instructing that Wilson should be paid. Nothing, however, was done until May 1947 when Heyer, on behalf of petitioner, and Wilson executed an agreement whereby Wilson agreed to accept $13,814.87 in full settlement. Full payment to Wilson is to be made during this year. Opinion Compensation Issue. We have concluded that the amounts paid by petitioner to Heyer during 1942 and 1943 represented reasonable compensation. Petitioner's earning capacity depended almost exclusively on Heyer's inventive and technical skill and his sales ability and contacts. The compensation Heyer was paid was large but was not, in our opinion, disproportionate to the value of the services he contributed. The percentage of sales formula by which Heyer's compensation was computed derived from an employment contract negotiated at arm's length in 1927. That *58 contract expired after two years but the formula persisted by mutual agreement. We consider the percentage formula used as a fair and reasonable one which necessarily geared Heyer's compensation to the value of the services he contributed. Respondent points to the fact that Heyer was in military service during part of 1942 and all of 1943 and therefore was unable to contribute his usual services to petitioner. During 1942 and 1943 petitioner's business consisted predominantly of manufacturing and selling military equipment to the government. New development work was restricted by this situation and by other wartime conditions. Moreover, after Heyer entered upon active duty in the military service in 1942 he was in continual touch with petitioner's affairs in an advisory and policy-making capacity and had many business conferences in reference thereto during such period. He also spent considerable time and money in keeping up his contacts with representatives of petitioner's commercial customers. Respondent suggests that Gray was hired as a substitute for Heyer who intended to enter military service. Respondent argues that Heyer was therefore being paid in 1942 and 1943 for the *59 work Gray was doing. The record is clear that when Gray was hired Heyer had no intention or expectation of entering military service. Gray was valuable but he performed the more routine duties of an executive and administrator. This was not to substitute Gray for Heyer but to enable Heyer to perform the development and sales work which was the essence of petitioner's income-producing ability and for which Heyer had unusual genius. Petitioner's sales from the beginning of its operations through the taxable years here involved were attributable almost entirely to merchantable items the production and sales of which were the result of Heyer's inventive, engineering and developing genius and of his salesmanship. Keeping these facts in view, it is obvious that the amount of compensation which reflects the reasonable value of Heyer's services in any given year is large but difficult to determine within a range of approximation. While the amount of compensation paid to Heyer in a given taxable year was measured by a percentage of the sales in such year, the services of Heyer to which the fact and volume of such sales were attributable spanned, with progressive and cumulative accomplishment, *60 the taxable years involved and the prior years of Heyer's services. In other words, there can be no segregation by taxable periods of the productive effect of Heyer's services rendered in each taxable period. On the other hand, there is a lapping over or piling up from the prior to the succeeding years of the effect of Heyer's services on petitioner's production and sales. This situation serves further to illustrate the difficulty of evaluating for a given year, apart from the agreement of the parties interested, the amount of reasonable compensation for Heyer's services. Many years prior to the taxable years here involved petitioner and Heyer in an arm's length agreement established a formula by which to measure Heyer's compensation. The compensation paid Heyer in the taxable years before us was measured by that formula which has been consistently followed since its establishment. The amount of the compensation so paid appears to us to be reasonable under all the circumstances here present and we so hold. Contingent Reserve Issue. Respondent's action in adding the contingent reserve item of $13,814.87 to petitioner's 1942 income is apparently based on the theory that petitioner *61 in 1942 determined never to pay this amount to Wilson. The facts of record do not support such a theory. The item was never credited to surplus. Placing an account payable in a contingent reserve account when there is a controversy as to whether such account will be accepted by the obligee in full settlement seems to us a reasonable procedure and not one necessitating restoring such item to income. The obligation continues to be recognized by petitioner and full payment has been arranged for this year. Under these circumstances, we think respondent erred in adding this item to income and we so hold. The two cases relied on by respondent on this issue. , certiorari denied , and , are not in point. Decision will be entered under Rule 50. Footnotes
1. Actually, petitioner paid $85,631.56 and $59,925.05, but petitioner has stipulated the amounts given above as the correct amounts.↩
*. The net income per return for the years 1940 through 1943 reflect certain adjustments not here material.↩